U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

SEP 1 4 2015

TONY R. MOORE, CLERK
BY _____ DEPUTY

### UNITED STATES DISTRICT COURT

### WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

LUV N CARE, LTD                                   CIVIL ACTION NO. 3:11-1878

VERSUS                                            JUDGE JAMES T. TRIMBLE, JR.

ANGEL JUVENILE PRODUCTS, AKA LAREDO              MAG. JUDGE HAYES

### AMENDED MEMORANDUM RULING

Before the court are the following motions: (1) "Certain Defendants' Motion to Dismiss for Lack of Personal Jurisdiction" (R. #118) filed by defendants, Lerado Group (Holding) Company Limited, Lerado Group Limited, Lerado China Limited and Lerado Overseas Limited (collectively referred to as the "Lerado Group"), (2) "Defendants' Motion for Partial Summary Judgment" (R.#119) filed by defendants, Angel Juvenile Products, Peaceful Trust Co. Ltd., Lerado Group LTD., Lerado Group (Holding) Company Limited, Lerado Overseas Limited, Lerado China Limited and Angel Juvenile Products (Zhong Shan) Company Limited, (3) "Plaintiff's Motion for Partial Summary Judgment" (R. #138), and (4) "Defendants' Motion to Strike and in the Alternative Response to Plaintiff's Motion for Partial Summary Judgment" (R. #145) filed by defendants, Angel Juvenile Products, Peaceful Trust Co. Ltd., Lerado Group Ltd., Lerado (Holding) Co., Limited, Lerado Overseas Limited., Lerado China Limited and Angel Juvenile Products (Zhong Shan) Company Limited.

### STATEMENT OF THE CASE

In its original complaint, plaintiff, Luv 'n Care, Ltd. ("LNC") names defendant, Angel Juvenile Products ("AJP"), a corporation organized pursuant to the laws of China with its principal office and place of business in Shanghai, People's Republic of China ("PRC"). LNC alleges that AJP and Peaceful Trust Company Limited entered into two (2) 5-year distribution agreements with it in August of 2002.[1] Defendant, Angel Juvenile Products (Zhong Shan) Company Limited (herein after referred to as "AJP (Zhong Shan)"), asserts that it is the signatory to the distribution/sales agreement and that AJP and AJP (Zhong Shan)) is the same company.[2] Defendants further maintain that AJP and Angel Juvenile Products Company Limited are incorrectly named and thus should be dismissed.[3] The agreements obligated AJP (or AJP (Zhong Shan)) and Peaceful Trust to make minimum purchases and pay 6% royalties to plaintiff.[4] LNC alleges that these defendants never purchased any products, nor did they pay any royalties pursuant to the distribution agreements.  Thus, LNC alleges that AJP (Zhong Shan) and Peaceful

---

[1] Petition, ¶ ¶ 1, 2, and 3, R. #1-2.
[2] Defendants' memo. in support of motion to dismiss, p. 3, R. #118-2.
[3] Defendants' motion to dismiss, p. 3, R. #118-2.
[4] Year 1 required sales revenues of $1,500,000
 Year 2 required sales revenues of $3,000,000
 Year 3 required sales revenue of $5,000,000
 Year 4 required sales revenue of $8,000,000
 Year 5 required sales revenue of $11,200,000. Id. ¶ 4.

Trust owe it commissions for the duration of the 5-year contract in the total amount of $1,722,000.[5]

LNC also alleges that it entered into an oral contract with The Lerado Group Limited, to make molds for plaintiff to manufacture its product; pursuant to the oral contract, LNC paid the sum of $100,000 for the molds, but defendants did not honor the contractual obligation and instead took the molds, and made and sold copycat products.[6]

In its amended complaint, LNC added Peaceful Trust Company Limited ("Peaceful Trust")[7]; LNC alleges that Peaceful Trust, as a signatory of one of the distribution agreements, was also liable for breach of contract. LNC further names, under Louisiana's "single business enterprise" doctrine, numerous other defendants as follows:

(1) Angel Juvenile Products (Zhong Shan) Company, Limited ("AJP Zhong Shan"), organized under the laws of the People's Republic of China, having a principal office and place of business in China;[8]
**(2)** Angel Juvenile Products Company, Limited, ("AJP Ltd") organized under the laws of China and/or Hong Kong, having a principal office and place of business in China;[9]
(3) Shanghai Wexin Juvenile Company ("SWJC"), organized under the laws of China and/or Hong Kong, having a principal office and place of business in China and/or Hong Kong;[10]

_____

[5] Id., ¶ 5.
[6] Id., ¶ 8.
[7] Peaceful Trust is organized under the laws of China and/or Hong Kong, having a principal office and place of business in China and/or Hong Kong.
[8] Defendants' exhibit C, Leung depo. p. 98; Defendants' exhibit D, Leung affidavit, exhibit 7.
[9] Plaintiff's exhibit H, R. #122-8.
[10] Plaintiff informs the court that defendants' former counsel sent plaintiff's counsel a letter dated February 22, 2013 which gives the address for two different "Angel" entities. (Plaintiff's exhibit H, R. #122-8.) The letter also

(4) Lerado China Limited ("LCL"), organized under the laws of British Virgin Islands, having a principal office and place of business in China and/or Hong Kong;[11]

(5) Lerado Industrial Limited ("LIL"), organized under the laws of China, having a principal office and place of business in China and/or Hong Kong;[12]

(6) Lerado Overseas Limited ("LOL"), organized under the laws of British Virgin Islands, having a principal office and place of business in Taiwan or China;[13]

(7) Lerado Group Limited ("LGL"), organized under the laws of the British Virgin Islands, having a principal office and place of business in China and/or Hong Kong;[14]

(8) Lerado Group (Holding) Company Limited ("LGHCL"), organized under the laws of Bermuda, having a principal office and place of business in Bermuda;[15]

In LNC's first amending complaint, plaintiff alleges that each of these entities is an instrumentality or adjunct of each other making them all liable to plaintiff for the damages sought under the single business enterprise theory.  LNC asserts that Henry Huang controlled all of the named entities and/or handled or controlled the dealings with plaintiff.[16]

---

stated that "[u]pon information and belief, Shanghai Wenxin Juvenile Co. has been dissolved." Id. However, Mr. Huang sent LNC a fax which stated that Angel Juvenile Products changed its name to Shanghai Wenxin Juvenile Co. (Plaintiff's Exhibit A.) To further the confusion, in response to plaintiff's discovery about who signed the contract with LNC, defendants responded that a Mr. Chen from Wenxin Juvenile Co. erroneously and without authority signed the agreement on behalf of AJP and that Wenxin had no legal connection with AJP, but that Mr. Chen was simultaneously employed by AJP at the time the distribution agreement was signed. Plaintiff's exhibit I. Finally, Mr. Allen Lee, in-house counsel for Laredo Group, was sworn in during Mr. Huang's testimony and testified that Angel Juvenile Products China was renamed Shanghai Wenxin Juvenile, (Plaintiff's exhibit J, p. 24) even though Mr. Lee testified later that that there were no name changes in the Lerado Group. (Id. p. 40) In his deposition, Mr. Huang could not recall the name change; (Id. p. 29) even though he sent a signed faxed letter dated January 27, 2003, to LNC about the name change (Plaintiff's exhibit, A, R. #122).

[11] Defendants' exhibit C, Leung Depo., p. 91.

[12] Defendants' exhibit D, Leung Affidavit, exhibit 4; as of this date, this defendant has not been served.

[13] Defendants' exhibit D, Leung Affidavit, exhibit 5; Defendants' exhibit C, Leung depo. pp. 29-31; Plaintiff's exhibit H, R. #122.

[14] Its principal activity is to serve as a holding company; it has no physical operations or employees. Defendants' exhibit D, Leung Affidavit, ex. 1; Defendants' exhibit C, Leung depo., pp. 81-82.

[15] Plaintiff's exhibit H, R. #122.

[16] Id. ¶ ¶ 17 and 18.

LNC also alleges that on or about February 10, 2003, it received a fax from Henry Huang which informed plaintiff that AJP had changed its name to Shanghai Wexin Juvenile Company ("SWJC"); SWJC would assume AJP's obligations under the distribution agreements.[17]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, when viewed in the light most favorable to the non-moving party, indicate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[18] A fact is "material" if its existence or nonexistence "might affect the outcome of the suit under governing law."[19] A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.[20] As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim."[21] Once the movant makes this showing, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial.[22]  The burden requires more than mere

---

[17] Id. ¶ 23.
[18] Fed. R. Civ. P. 56(c).
[19] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).
[20] Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999).
[21] Vera v. Tue, 73 F.3d 604, 607 (5th Cir. 1996).
[22] Anderson, 477 U.S. at 249.

allegations or denials of the adverse party's pleadings.    The non-moving party must demonstrate by way of affidavit or other admissible evidence that there are genuine issues of material fact or law.[23] There is no genuine issue of material fact if, viewing the evidence in the light more favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party.[24] If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.[25]

## LAW AND ANALYSIS

## MOTION TO DISMISS

Defendants have filed a motion to dismiss (R. #118) the following entities for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1),:

1. Lerado Group (Holding) Company Limited,
2. Lerado Group Limited,
3. Lerado China Limited,
4. Lerado Overseas Limited,
5. Lerado Industrial Limited. (as of this date, this defendant has not been served)

(Collectively referred to as "moving defendants").

---

[23] Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).
[24] Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).
[25] Anderson, 477 U.S. at 249-50.

Moving defendants maintain that they are not parties to the above mentioned distribution agreements. The distribution agreements contain provisions that subject the parties to the agreements to the jurisdiction of this court.  Thus, defendants assert that this court has no personal jurisdiction over them because they are not parties to the distribution agreements and have no connections or presence in the State of Louisiana.

In its motion for partial summary judgment (R. #138), LNC maintains that these entities (which includes all defendants) are subject to the personal jurisdiction of the court based on Louisiana's single business enterprise theory. Plaintiff asserts that all of the defendants, with the exception of Lerado Industrial Limited and Shanghai Wenxin Juvenile Company, who have not been served, fall under Louisiana's "single business enterprise."

Both motions (R. # 118 and 138) will be addressed contemporaneously herein.

In diversity actions such as this, federal courts may exercise jurisdiction over a non-resident defendant only to the extent that a state court within the federal court's district could exercise jurisdiction.[26] The reach of this jurisdiction is defined by: (1) the long-arm statute of the forum state; and (2) the Due Process Clause of the Fourteenth Amendment for the Federal Constitution.[27] "When a nonresident defendant presents a motion to dismiss for lack of

---

[26] Thompson v. Chrysler Motors Corp., 755 F.2d 1162, 1165 (5th Cir. 1985).
[27] Electrosource, Inc. v. Horizon Battery Techs., Ltd., 176 F.3d 867, 871 (5th Cir. 1999).

7

personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident."[28]

"The limits of the Louisiana long-arm statute are coextensive with the constitutional due process limits.   Therefore, the inquiry is whether jurisdiction comports with federal constitutional guarantees."[29]

The Due Process Clause of the Fourteenth Amendment guarantees that no federal court may assume *in personam* jurisdiction *of* a non-resident defendant unless (1) the defendant has purposefully availed itself of the benefits and protections of the forum state by establishing minimum contacts with the forum state; and (2) the exercise of jurisdiction over the defendant does not offend traditional notions of fair play and substantial justice.[30]

Jurisdiction may be general or specific, depending on the nature of the defendant's forum-related contacts.[31] The court may exercise "general" jurisdiction over a defendant when he has substantial and "continuous and systematic" contacts with a forum state.[32] Thus, "[t]o confer general jurisdiction, a defendant must have a business presence in the forum state."[33]

---

[28] Stuart v. Spademan, 772 F.2d 1185, 1192 (5th Cir. 1985).
[29] Jackson v. Ganfoglio Giuseppe, S.R.L., 615 F.3d 579, 584 (5th Cir. 2010), citing Walk Haydel & Assoc. v. Coastal Power Prod. Co., 517 F.3d 235, 242-43 (5th Cir. 2008).
[30] Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).
[31] Luv N' Care v. Insta-Mix, Inc., 438 F.3d 465, 469 (5th Cir. 2006).
[32] Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415 (1984).
[33] Jackson, 615 F.3d at 584.

In the absence of continuous and systematic contacts with a forum state, a court may exercise "specific" jurisdiction over a defendant where a plaintiff's suit arises out of, or is related to the defendant's limited contacts with the forum state.[34] Specific jurisdiction requires that (1) the defendant have minimum contacts with the forum state; (2) the plaintiff's cause of actions arise out of or result from defendant's contacts with the forum state; and (3) the exercise of personal jurisdiction is fair and reasonable.[35]

*Louisiana's "single business enterprise"*

In June 2014, Dorel Industries, Inc. ("Dorel") purchased seventeen subsidiaries under the parent, LGHCL.  Three (3) of the entities sold to Dorel are also three (3) moving defendants: LOL, LCL and LIL.[36] The sale did not include LGHCL and LGL. As a side note, the court observes that LNC filed a motion for leave to amend on April 7, 2015, wherein LNC attempted to name Dorel and Henry Huang[37] as defendants.  On May 11, 2015, Magistrate Judge Hayes denied that motion finding that the untimely proposed amendment would unduly prejudice the parties and the court.  LNC did not appeal this ruling to the undersigned.

---

[34] Helicopteros Nacionales, 466 at 414.
[35] Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 271 (5th Cir. 2006), Alpine View Co. Ltd. v. Atlas Copco AB, 205 F. 3d 208, 215 (5th Cir. 2000), citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985).
[36] Defendants' exhibit B, Company Circular, p. 10.
[37]  It is alleged that Mr. Huang controlled all of the named entities and proposed entities and personally handled the transactions with LNC and Dorel Industries, Inc.

The legal fiction of distinct corporate entities may be disregarded when a corporation is so organized and controlled as to make it merely an instrumentality or adjunct of another corporation.[38] If one corporation is wholly under control of another, the fact that it is a separate entity does not relieve the latter from liability, but in such cases the former corporation is merely an alter ego or business conduit of the latter, and the court is free to disregard their separate corporate entity.[39] Defendants, LGHCL, LGL, LCL, LOL and LIL, maintain that they are separate and distinct enterprises which have no connections with Louisiana to warrant either general or specific *in personam* jurisdiction over them. Hence, they seek dismissal.

The mere existence of a parent-subsidiary relationship does not confer *in personam* jurisdiction over a foreign parent company based on its subsidiaries' contacts with a forum state.[40] A federal court may exercise jurisdiction over a defendant that is the alter ego of a corporation over which the court has jurisdiction.[41] Under Louisiana law, the single-business-enterprise theory must be proven by clear and convincing evidence before the principle of separate existence of corporations favored in Louisiana will be ignored.[42]

---

[38] Green v. Champion Ins. Co., 577 So.2d 249, 257 (La.App. 2nd Cir. 1991).
[39] Id.
[40] Hargrave v. Fibreboard Corp., 710 F.2d 1154, 1159 (5th Cir. 1983).
[41] Jackson, 615 F.34d at 586.
[42] Grayson v. R.B. Ammon & Assoc., 778 So.2d 1, 14 (La.App. 1 Cir. 2000).

Factors used to assess whether multiple entities constitute a 'single business enterprise' are similar to the factors used to determine alter ego status.[43] Under Louisiana law, the factors to be considered to determine whether one entity is an alter ego of another, or whether two entities are a single business enterprise, such that a court with jurisdiction over the entity has jurisdiction over the alter ego, include but are not limited to (1) common ownership, directors and officers, employees, and offices; (2) unified control; (3) inadequate capitalization; (4) noncompliance with corporate formalities; (5) centralized accounting; (6) unclear allocation of profits and losses between corporations; (7) one corporation paying the salaries, expenses, or losses of another corporation; and (8) undocumented transfers of funds between entities.[44] Other factors considered by Louisiana courts include:(1) unified administrative control of corporations whose business functions are similar or supplementary; (2) directors and officers of one corporation act independently in the interest of that corporation; (3) corporations financing another corporation, (4) receiving no business other than that given to it by its affiliated corporation; (5) services rendered by the employees of one corporation on behalf of another corporation; (6) common offices; (7) excessive fragmentation of a single enterprise into separate corporations; and (8) corporation with identity of substantial identity of ownership,

---

[43] Jackson, 615 F.3d at 586-87.
[44] Jackson, 615 F.3d at 581.

that is, ownership of sufficient stock to give actual working control.[45] No one factor is dispositive.

Even when some factors suggest that one entity is the alter ego of another, the maintenance of corporate formalities tips in favor of finding that the entities are not alter egos.[46] Where neither side presents authority for liability under the "single business theory", there are genuine issues of material fact to be weighed by the trier of fact.[47]

Based on an organizational chart presented and attached to Mr. Huang's deposition and the sworn testimony of in-house counsel, Mr. Allen Lee, the court has determined that LGHCL is the parent company of subsidiaries Peaceful Trust, LGL and LCL.  LGL owns LIL and LOL. LIL owns AJP, whose name was changed in 2003 to Shanghai Wenxin Juvenile Company (referred to as AJP (Shanghai). AJP (Shanghai) owns AJP (Zhong Shan) and AJP, Co. Ltd.[48]

Generally, plaintiff maintains that the testimony of Mr. Leung (specifically, Mr. Leung's CV),the Financial Controller/Finance Manager of LGHCL, and the deposition testimony of Mr. and Mrs. Huang contain numerous contradictions and therefore, are circumspect, something a trier of fact must decide as to credibility. As noted by plaintiff, both defendants, AJP

---

[45] Green, 577 So.2d at 257-258.
[46] Dalton v. R & W  Marine, Inc., 897 F.2d 1359, 1363 (5th Cir. 1990)(declining to find an alter ego even though one entity owned 100% of its subsidiaries, was responsible for corporate policy, funneled revenues into centralized accounts, and filed consolidated tax returns because those factors were "outweighed, albeit modestly" by observation of corporate formalities).
[47]  Town of Haynesville v. Entergy Corp., 840 So.2d 597 (La.App. 2nd Cir. 2003).
[48]  Plaintiff's exhibit K, R. #122.

(defendants maintain this is the same entity as AJP (Zhong Shan)) and Peaceful Trust are subject to the jurisdiction of the court by the Forum Clause in the distribution agreements.[49] Plaintiff also informs the court that Mr. Huang is misleading the judicial system by claiming not to be able to speak English, thus requiring an interpreter at his deposition. In his declaration, Mr. Hakim strongly disputes this declaring that Mr. Huang visited the LNC office in Monroe, Louisiana and conversed in English with all persons he met there, and at a welcoming party in Hong Kong.[50]

LNC presents a chart[51] of the pertinent companies in this litigation.   During his deposition, Mr. Huang, being assisted with an interpreter and his in-house counsel, Allen Lee failed to answer a majority of the questions asked of him, such as what was his position with each of the companies.[52] However, of significance, when being asked about the various companies, Mr. Huang testified that "I have many companies"[53] which weighs in favor of LNC's single business enterprise theory. When asked about the ownership or location of the various entities, Mr. Huang becomes reluctant to answer responding to most of the questions with an "I don't know,"[54]  he "isn't sure,"[55] or he "forgot."[56] Defendants submit that Mr. and Mrs.

---

[49] Plaintiff's exhibit E and F, ¶ 14.
[50] Plaintiff's exhibit G, declaration N. Edward Hakim, p. 1.
[51] Plaintiff's exhibit K, which was attached as exhibit 40 to Huang's deposition.
[52]  Plaintiff's exhibit J.
[53] Id. p. 19, line 21.
[54] Id., p. 37.
[55]  Id. p. 27.

Huang's deposition testimony should not be considered by the court because neither Mr. nor Mrs. Huang was noticed as Rule 30(b)(6) representatives by plaintiff.  Be that as it may, the court has read Mr. Huang's entire testimony and finds that he was elusive and not cooperative which indeed causes the court concern as to his credibility.

LNC submits summary judgment evidence to establish that Mr. Huang was the "boss" of all of the companies, and or that he *was* the Board, and that when dealing with LNC, it was hard to decipher which company you were dealing with due to different company letterheads being used for correspondence as to both the distribution agreements and the mold contract.[57]  Mr. Leung testified that Henry Huang, Mrs. Huang and Peter Chen Chun Chieh (Peter Chin) are the executive directors who make the final decisions for all of the named defendants and that they "head up" all of the entities listed on the organizational chart.[58] LNC submits summary judgment evidence to challenge Mr. Leung's credibility, not only with the disparities in his CV,[59] but also his sworn testimony. For example, Mr. Lueng testified that LOL does not have employees; during his deposition, he was shown correspondence with LOL and a business card of Daniel Wang, a former employee of this company.[60]  Again, Mr. Lueng was unable to explain how a company he claimed had no employees, actually had employees that dealt with and

---

[56]  Id. p. 47.
[57]  Plaintiff's exhibit G, M, and N, R. #122.
[58]  Plaintiff's exhibit K; Plaintiff's exhibit L, PP. 76-77, 80, R. #122.
[59]  Comparing Mr. Leung's CV with a Business Week's Internet statement; Mr. Leung was unable to explain in his deposition the disparity. Plaintiff's exhibit L, R. #122.
[60]  Plaintiff's exhibit L, P. 104, R. #122.

corresponded with LNC via letters using LOL letterhead, and/or through e-mails. LNC further

points out numerous other disparities and/or contradictions in the testimonies of Mr. and Mrs.

Huang and Mr. Leung as to relevant information about the various companies.[61]

Mrs. Huang was asked about employee Daniel Wang and responded as follows:

> A.   We did not make such clear distinctions.   He reported to
> Peaceful Trust in the first place. He speaks English, so
> sometimes those exports case originating from our Mainland
> Chinese companies could be handled by him, as well as he
> handled things for more than one company. It's quite
> inclusive. The highest company is Laredo Group.  For all those
> companies under this top holding company, we do not have
> very detailed—very distinctive separations. He actually first
> reported to Peaceful Trust as his first job. However, any time
> when he went in business trips, he might also handle cases for
> any other companies of the group. . . .[62]

LNC submits defendant, Angel Juvenile's answers to plaintiff's fourth set of

interrogatories and requests for production, which sought the minutes of all corporate

meetings. Defendant's response was that Angel Juvenile Products did not have any.[63]    Mr.

Leung testified that none of the subsidiaries have meetings.[64]

Defendants rely on each of the company's incorporations, its purpose ad status as to

physical operations, employees, if it holds a bank account, and the corporate structure of all of

---

[61] Plaintiff's exhibit L and O, R. #122.
[62] Plaintiff's exhibit O, pp. 34-35.
[63] Plaintiff's exhibit P.
[64] Plaintiff's exhibit L, pp. 72-74, R. #122, referring to the entities on the chart, plaintiff's exhibit K.

the entities. Specifically, LGHCL allegedly has no physical operations; it holds a bank account which issues shareholder dividends from cash earned by subsidiaries and transferred to LGHCL.[65] LGHCL maintains individual accounting ledgers to track funds that flow from the subsidiaries to LGHCL.[66] Each subsidiary has its own accounting team that prepares and reviews accounting records and handles daily finance operations.[67] Finance managers are assigned by location, not by specific entities.[68]

LCL, an investment holding company which trades goods manufactured by other companies located in China,[69] received a payment from LNC in the amount of $99,065 pursuant to the oral agreement in which the defendant(s) was to make the tooling molds that are at issue in this suit.[70] Defendants maintain that the payment was received on behalf of Shanghai Daily Article Company Limited, the company charged with working with LNC in developing the tooling molds.[71]

LOL is a privately held investment holding company, [72] with no physical operations; its principal activity is as 100 percent owner of Peaceful Trust.  Both of these companies were sold

---

[65] Defendants' exhibit C, Leung depo. p. 88, R. #118.
[66] Id. p. 17.
[67] Id. Exhibit 4, p. 17-18.
[68] Id. p. 32.
[69] Defendants' exhibit A, 2013 Annual Report, p. 98; Defendants' exhibit C, Leung depo. p. 91. R. #118.
[70] Defendants' exhibit D, Leung affidavit, exhibit 8, R. #118.
[71] Defendants' motion to dismiss, p. 8, R. #118.
[72] Defendants' exhibit C, Lung depo. p. 89; Defendants' exhibit B, Company Circular, p. 10, R. #118.

to Dorel Industries.[73] Peaceful Trust allegedly acquires raw material in Taiwan and sells them to LGHCL subsidiaries located in the People's Republic of China ("PRC").[74] Peaceful Trust has no business dealings with AJP (Zhong Shan).[75]

AJP (Zhong Shan) is licensed for domestic China sales only and is not permitted to export goods and products outside the PRC.[76]

Moving defendants maintain that LNC cannot meet its burden of showing that these entities are alter egos of any entity over which this court has jurisdiction in this action, such that this court may disregard the concept of corporate separateness. Moving defendants assert that there is no evidence of undocumented fund transfers and that each company has its own books and accounting, in addition to its own bank accounts. Depending upon location, the companies have different finance managers and funds transfers are accounted for. There is no evidence of unclear profit and loss among the entities. Moving defendants remark that each entity has followed all applicable formalities, all of which supports a ruling based on the above mentioned factors, that the entities at issue are separate business enterprises. Moving defendants further rely on the fact that the sale to Dorel Industries included only some of the defendants and not others, namely, LGHLC and LGL. Thus, moving defendants maintain that

---

[73] Defendants' exhibit B, Company Circular, pp. 4 and 10; Defendants' exhibit C, Leung depo. p. 89-90, R. #118.
[74] Defendants' exhibit C, Leung depo. pp. 94-95, R. #188.
[75] Id. p. 97.
[76] Defendants' exhibit C, p. 99, R. #118.

they are separate and distinct enterprises, and because they have no connections with Louisiana to warrant either general or specific *in personam* jurisdiction, they must be dismissed.

The court finds that in order to make a determination as to whether the entities should be treated as a single business enterprise, and considering the disparities and contradictions shown herein, we would have to make a credibility determination.  Furthermore, plaintiff has submitted sufficient summary judgment evidence to create a genuine issue of material fact for trial.  Accordingly, the motion to dismiss will be denied; the motion to strike will be denied, and the motion for partial summary judgment filed by plaintiff will be denied.

### MOTION FOR SUMMARY JUDGMENT AS TO DISTRIBUTION AGREEMENTS

Defendants, AJP, Peaceful Trust, LGL, LGHLC, LOL, LCT and AJP (Zhong Shan) move for partial summary judgment; defendants move to limit plaintiff's damages for royalties on unsold products to a date it argues the distribution agreements were terminated by plaintiff.

On August 21, 2002, LNC entered into two distribution agreements with two of the named defendants, AJP (Zhong Shan) and Peaceful Trust. Two separate agreements with the same terms were executed because they covered separate territories.[77] The distribution agreements appointed the two entities as the exclusive distributors for all of LNC's account in PRC and ROC. The agreements required AJP (Zhong Shan) and Peaceful Trust to pay

---

[77] Defendants' exhibit B, Nouri Hakim depo. R. # 119.

commissions and royalties to LNC based on the infant care products sold in their respective territories.[78] The launch date for the distribution of the products was July 1, 2002 for a period of five (5) years, unless either party terminated the agreement(s) prior to their expiration.[79] Neither of the distribution agreements contained an acceleration clause.

On October 14, 2003, Nouri Hakim, CEO of LNC, sent a letter to Mr. Huang, chairman of LGHCL, complaining that AJP (Zhong Shan) and Peaceful Trust had violated provisions of their distribution agreements. The most significant violation was that the two companies had failed to pay the requisite royalties in accordance with the terms of the agreements.  The letter stated as follows:

> If full payment is not received within 14 days of today then Luv n' care Ltd. considers both contracts voided as of that date. As of that date Luv n' care demands payment for the full term of the contracts, as it considers both contracts to be accelerated in nature.  If a proper resolution cannot be reached we will have no other alternative but to litigate this matter to protect our interest.

In that letter, Mr. Hakim, warned that if AJP (Zhong Shan) did not make payment within 14 days of the letter, Plaintiff would consider both of the agreements void as of that date.[80] AJP (Zhong Shan) and Peaceful Trust made no payments to LNC.

───────────────────

[78] Id. p. 13.
[79] Defendants' exhibit B, ¶ ¶  3 and 17.
[80] Id. pp. 18-21.

On December 6, 2004, LNC entered into a distribution agreement ("GoodBaby Agreement") with a company called GoodBaby (not a party to this lawsuit or affiliated in any way with the defendants in this lawsuit), wherein LNC granted exclusive distributor rights to sell the same infant care products in the same territories that had been granted to AJP (Zhong Shan) and Peaceful Trust.[81]

Paragraph 18 of the Distribution Agreement provides the following with regard to terminating the agreements:

18.   Termination

(a) ". . . . LNC may terminate this Agreement by giving Distributor written notice of such termination by registered mail, the effective date of which shall be not less than one hundred eighty (180) [sic] after the date of receipt of the notice by Distributor in the event that:

...

(ii)     Distributor fails to sell the minimums... and/or fails to pay the minimum commission. . . ."

...

In the event of a termination of the contract by either party, LNC at its option, MAY DEMAND all royalties on unsold product by distributor be paid within thirty (30) days of that termination. . . .[82]

---

[81] Defendants' exhibit B, pp. 27-28; Defendants' exhibit D, ¶ 1; Defendants' exhibit E, Joseph Hakim, pp. 21-22.
[82] Defendants' exhibit B, attached as exhibit 1 to Hakim depo., R. #119-6.

Defendants argue that this provision provides a remedy to plaintiff for "unsold product" in the event of a breach relying on the above provision as well as ¶ 18 (b) which refers to terms such as "repurchase product," "inventory," "avoid destruction," market dumping," and "sell-off."   Thus, defendants maintain that the remedy provided by these provisions would be effective when the distributors had physical possession or control of plaintiff's products.[83] Defendants argue that the termination provision does not require them to pay royalties for the entire 5 year term of the agreements. Thus, defendants assert that the only royalties they owe would be for unsold products in their possession at the time the distribution agreements were terminated—of which there were none.

Next, defendants maintain that the distribution agreements had no monetary value. Defendants remark that the purpose of the agreements was exclusivity.  Defendants submit that if plaintiff breached the agreements, they lost an exclusive seller, whereas, if defendants breached the agreements, it lost the exclusive right to sell LNC's products.  Thus, defendants posit that LNC's only remedy is for royalties on unsold products. Defendants maintain that even if the court finds that defendants breached the agreements, as a matter of law, no monetary damages would be recoverable by LNC beyond royalties on unsold product as of the date of termination of the agreements.

---

[83]   ¶ 18(b) gives LNC the option to repurchase product from the distributor, and requires the parties to settle in good faith and in the best interest of each party to avoid destruction and market dumping.

Alternatively, defendants maintain that if the court determines that LNC is entitled to monetary damages, these damages would not accrue beyond the date that plaintiff terminated the distribution agreements, October 28, 2014. (The letter gave defendants 14 days to make payment; failure to make payment would result in the agreements being voided as of that date).  Defendants admit that it did not make payment to LNC. Defendants remark that the agreement did not contain an acceleration clause. Defendants rely on Barnco Int'l, Inc. v. Arkla, Inc.,[84] In Barnco, the court held that the doctrine of equitable estoppel is available where one party to a contract gains an advantage and causes a detriment to the other party. The court reasoned that a party to an agreement should not be able to terminate that agreement on a specific date and then elect to pursue damages, to which it is not entitled after the termination of the agreement. Defendants submit that LNC's early termination of the agreements caused a detriment to defendants by terminating their ability to market and sell LNC products.

Again, in the alternative, if the court determines that the distribution agreements were not voided as of October 28, 2003, and damages are owed beyond that date, defendants maintain that the GoodBaby Agreement, which granted GoodBaby exclusive rights to distribute the same products, executed December 6, 2004, was a breach by LNC which terminated the agreements and no damages could be owed by defendants beyond December 6, 2004.

---

[84] 628 So.2d 162 (La.Ct. App. 1993), writ denied, 635 So.2d 1105 (La. 1994).

Furthermore, defendants argue that if LNC received damages beyond the GoodBaby Agreements, any damages beyond December 6, 2004 would be a windfall to LNC.

It is undisputed that neither party to the distribution agreements (AJP (Zhong Shan) or Peaceful Trust) reported any sales to LNC or paid the commissions to LNC on the required minimum sales for said amounts.[85] LNC maintains that the October 14, 2003 letter had no legal effect because it did not comply with the terms of the termination provision which required a notice to terminate to be sent via registered mail. Instead, LNC argues that the letter was only a warning. Thus, LNC argues that because the letter was not sent via registered mail, the October 14, 2003 letter is irrelevant. LNC also argues that the distribution agreements provide that once notice has been provided in compliance with the agreements, the distributor has an additional one hundred and eighty days before the termination becomes effective.

LNC argues that ¶ 18(A) expressly states that "In addition to any rights and remedies which LNC may have under the law and equity. . ." and that this provision gives LNC the right to pursue damages. Paragraph 20 provides the following:

> **20. Minimum Quantities/Minimum Payments:**
>
> **(a) Principle of calculation of the commission owed by Distributor to LNC: The rate of commission (see Exhibit 2) will apply to the actual sales of Distributor. Sales are net sales (less VAT, local taxes, discounts and rebates).**

---

[85] Plaintiff's exhibit E, attached to distribution agreement as exhibit 2.

**(b) Minimum quantities and minimum payments:**

**Distributor shall pay commissions based on sales not less than those listed in Exhibit 2. Said minimums shall not be presumptive of Distributor's efforts to sufficiently market Trademarked Product. Distributor shall pay LNC a commission as agree to in Exhibit 2.   Commissions will be due on all invoiced/product within fifteen (15) days of the end of each quarter (pursuant to Exhibit 6).The parties further agree to adopt the payment schedule as set out in Exhibit six (6). Upon expiration of the initial term and any extensions thereafter of this Agreement, LNC will invoice Distributor for payment of any shortfall for the guaranteed commission which was not met and paid, if actual commissions fail to meet minimum commission amounts. . . Distributor shall be obligated to make payment for said shortfall at the end of each contract year.**

LNC maintains that the letter, which was not in compliance with the provision in the distribution agreements, was a scare tactic and did not operate to actually terminate the agreements.  LNC then remarks that in order to not lose its brand name recognition in the relevant territories, and to mitigate its damages, it sought other entities to replace the defendants, namely GoodBaby. LNC remarks that the GoodBaby agreement was not as lucrative as the two distribution agreements because competitors in China and Taiwan were aware of LNC's agreement with defendants.  Thus, the GoodBaby agreement set lower minimums; funds received in 2006 was $164,614.48 and the sum of $51,952.27 based on the six months left on the AJP (Zhong Shan)  distributions agreements.  LNC also notes that there was no distribution agreement for the territory in Taiwan covered by the Peaceful Trust distribution agreement. Thus, plaintiff submits that these amounts are the most defendants should be given credit for, if any.

24

LNC relies on Crow v. Southern Natural Gas Co.,[86] to support its position that any notice not in compliance with the terms of a contract is not sufficient notice to terminate a contract. However, in Crow, the court concluded that "judicial demand" was not sufficient notice to terminate a contract.  The facts in that case are clearly distinguishable from the instant case.

Defendants cite Board of Com'rs of Port of New Orleans v. Turner Marine Bulk, Inc.,[87] wherein the court held that where a party does not contest receipt of the notice, even though the lease agreement specifies that notice must be sent via certified mail, such failure to use certified mail does not invalidate the notice.[88] In Shepard Realty Co., Inc. v. United Shoe Stores, Inc.,[89] the Louisiana Supreme Court held that the contention that "the notice of default was improperly given" since it was not sent by registered mail was without merit. If the recipient of a letter actually received the letter, the effect and purpose of the letter is still in full force and effect, despite the fact that the letter was not sent via registered mail as required by the contract.[90]

As noted by defendants, there is no dispute that Mr. Huang received the October 14, 2003 letter, and no payment was received by LNC within the 14 days. Thus, defendants posit

---

[86] 210 So.2d 596 (La.App. 1968).
[87] 629 So.2d 1278 (La.App. 4th Cir. 1993).
[88] City of New Orleans v. Cheramie, 509 So.2d 58 (La.App. 1st Cir. 1987) writ denied, 512 So.2d 463 (La.1987)).
[89] 193 La. 211, 190 So. 383 (1939).
[90] Id.

that the agreements were terminated by LNC as of October 28, 2003, limiting their damage claim to unpaid royalties on minimum sales as of that date.

The court finds that LNC's October 14, 2003 letter was effective to terminate the distribution agreements as of October 28, 2003; consequently, LNC's damage claim of unpaid royalties for minimum sales would be limited to that date.  The court further finds that the distribution agreements clearly obligate defendants to pay commissions on minimum sales for each year (limited to the October 28, 2003 termination date) as set forth in Exhibit 2 of each of the distribution agreements.[91] Because we find that the distribution agreements terminated on October 28, 2003, we necessarily find that the agreements did not effectively terminate 180 days from the October 28, 2003 letter date, the December 6, 2004 GoodBaby distribution agreement date, or the 5-year expiration date.


## CONCLUSION

For the reasons set forth herein, the motion to dismiss for lack of jurisdiction (R. #118) will be denied as the court finds that there are genuine issues of material fact for trial; likewise, the motion for partial summary judgment (R. #138) filed by plaintiff and defendants' motion to strike (R. #145) will be denied; defendants motion for partial summary judgment ( R. #119) will

---

[91] Plaintiff's exhibit E, R. #121-5.

be granted to the extent that the court finds that the distribution agreements were terminated as of October 28, 2003, limiting plaintiff's damages for unpaid royalties as of that date.

**THUS DONE AND SIGNED** in Lake Charles, Louisiana on this 14th day of September, 2015.

_____
JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE